1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE DISTRICT OF ARIZONA**

8

9    Patrick Dingman,                        No. CV-17-02167-PHX-JZB

10              Plaintiff,                    **ORDER**

11   v.

12   Commissioner     of    Social    Security
     Administration,

13
                Defendant.
14

15

16        Plaintiff Patrick Keith Dingman seeks review under 42 U.S.C. § 405(g) of the final

17   decision of the Commissioner of Social Security ("the Commissioner"), which denied him

18   disability insurance benefits under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social

19   Security Act. Because the decision of the Administrative Law Judge ("ALJ") is supported

20   by substantial evidence and is not based on legal error, the Commissioner's decision will

21   be affirmed.

22   **I.    Background.**

23        On February 11, 2011, Plaintiff applied for disability insurance benefits and

24   supplemental security income, alleging disability beginning June 1, 2006. On October 3,

25   2012, he appeared with his attorney and testified at a hearing before the ALJ. A vocational

26   expert also testified. At the hearing, Plaintiff's counsel requested an amended onset date of

27   December 1, 2009. On October 23, 2012, the ALJ issued a decision that Plaintiff was not

28   disabled within the meaning of the Social Security Act. The Appeals Council denied

Plaintiff's request for review of the hearing decision, making the ALJ's decision the Commissioner's final decision.

## II. Legal Standard.

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

Harmless error principles apply in the Social Security Act context. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). An error is harmless if there remains substantial evidence supporting the ALJ's decision and the error does not affect the ultimate non-disability determination. *Id.* The claimant usually bears the burden of showing that an error is harmful. *Id.* at 1111.

The ALJ is responsible for resolving conflicts in medical testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). In reviewing the ALJ's reasoning, the court is "not deprived of [its] faculties for drawing specific and legitimate inferences from the ALJ's opinion." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

## III. The ALJ's Five-Step Evaluation Process.

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the

burden of proof on the first four steps, but at step five, the burden shifts to the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is still capable of performing past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's RFC, age, education, and work experience. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

At step one, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2011, and that he has not engaged in substantial gainful activity since June 1, 2006. At step two, the ALJ found that Plaintiff has the following severe impairments: "narcolepsy, sleep apnea, and obesity (20 CFR 404.1420(c))." (AR 407.)

At step three, the ALJ determined that, through the date of last insured, Plaintiff did not have an impairment or combination of impairments that meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. At step four, the ALJ found that Plaintiff has the RFC to perform:

> at least light work and some medium exertion jobs as defined in 20 CFR 404.1567(c) except the claimant could never climb ladders, ropes or scaffolds. He must avoid hazards such as moving machinery or unprotected heights.

(AR 408.)

The ALJ further found that Plaintiff, through the date of last insured, was unable to perform any of his past relevant work. At step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and residual functional capacity, through the date last insured, "there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed." (AR 414.)

**IV.    Analysis.**

Plaintiff argues the ALJ's decision is defective for four reasons: (1) "[t]he ALJ erred by omitting/rejecting the medical opinions of Dr. Anderson, treating neurologist/sleep specialist" (doc. 14 at 9-20); (2) the ALJ erred by crediting two non-examining physician opinions with significant weight (*id.* at 20); (3) "[t]he ALJ erred by rejecting [Plaintiff's] symptom testimony" (*id.* at 22-27); and (4) the ALJ erred "by not finding cataplexy and hypersomnia were 'severe'" medical impairments at step two (*id.* at 9 n.5). The Court will address each argument below;

**b.    Weighing of Medical Source Evidence.**

Plaintiff first argues that the ALJ improperly weighed the medical opinions of his treating physician, Dr. Troy Anderson, and examining physicians Drs. Larry Nichols, and Brian Briggs.

**1.    Legal Standard.**

The Ninth Circuit distinguishes between the opinions of treating physicians, examining physicians, and non-examining physicians. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, an ALJ should give greatest weight to a treating physician's opinion and more weight to the opinion of an examining physician than to one of a non-examining physician. *See Andrews v. Shalala*, 53 F.3d 1035, 1040-41 (9th Cir. 1995); *see also* 20 C.F.R. § 404.1527(c)(2)-(6) (listing factors to be considered when evaluating opinion evidence, including length of examining or treating relationship, frequency of examination, consistency with the record, and support from objective evidence). If it is not contradicted by another doctor's opinion, the opinion of a treating or examining physician

can be rejected only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830 (citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)). A contradicted opinion of a treating or examining physician "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-31 (citing *Andrews*, 53 F.3d at 1043).

An ALJ can meet the "specific and legitimate reasons" standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). But "[t]he ALJ must do more than offer [her] conclusions. [She] must set forth [her] own interpretations and explain why they, rather than the doctors', are correct." *Embrey*, 849 F.2d at 421-22. The Commissioner is responsible for determining whether a claimant meets the statutory definition of disability and does not give significance to a statement by a medical source that the claimant is "disabled" or "unable to work." 20 C.F.R. § 416.927(d).

### 2. Dr. Troy Anderson, M.D.

#### A. Treatment History and Medical Opinions.

Dr. Anderson is a neurologist and sleep specialist who treated Plaintiff from 2011 through 2016. (AR 238-66, 273-96, 385-93, 301-02, 691-713.) Dr. Anderson rendered eight medical opinions on Plaintiff's functional limitations during that time frame:

- In July 2011, Dr. Anderson opined that Plaintiff could not be gainfully employed because of his daytime sleepiness. Dr. Anderson also notes that, at that time, Plaintiff had failed multiple medications for narcolepsy and his daytime sleepiness persisted. (AR 301-02.)

- In April 2012, Dr. Anderson assessed work limitations from narcolepsy and sleep apnea with four narcoleptic episodes daily, symptoms lasting more than three hours, severe daytime sleepiness, and a total restriction from unprotected heights/moving machinery/driving automotive equipment. Dr. Anderson again noted that medications had failed. (AR 305-06.)

- In July 2012, Dr. Anderson again assessed that Plaintiff's impairments would limit his ability to perform work related activities. He notes that Plaintiff was still suffering from narcolepsy and daytime sleepiness, having one episode daily with symptoms lasting more than three hours, and advising total restriction from unprotected heights/moving machinery/driving automotive equipment. (AR 307-08.)

- In September 2012, Dr. Anderson assessed that Plaintiff continued to have difficulties with daytime sleepiness and cataplexy, and noted that Plaintiff could not afford his medication. Nor could Plaintiff afford the "MR angiogram" that Dr. Anderson ordered six months prior. Dr. Anderson concludes that Plaintiff "cannot perform work given his difficulties with severe daytime sleepiness" and state that "[h]e is to continue to refrain from driving and work with dangerous equipment as well as work at heights." (AR 385-86.)

- In August 2014, Dr. Anderson assessed that Plaintiff "has improved in terms of enjoying his life but has not improved to [sic] he can't go to work." (AR 702.) Dr. Anderson noted that Plaintiff experienced no side effects with Provigil, and that he increased the prescribed dosage of the drug to twice per day "to see if we can get up to this point." (*Id.*) "In the meantime, we continue to support disability." (*Id.*)

- In August 2016, Dr. Anderson completed a Medical Assessment of Ability to do Work-Related Physical Activities. (AR 740-41.) Therein, he found that Plaintiff's severe sleepiness precluded an 8-hour work day. (AR 740.) Additionally, he found that Plaintiff, in an 8-hour work day, had the following limitations: Plaintiff can sit for six hours, stand/walk for six hours, lift 50 pounds or more, carry 50 pounds or more, and Plaintiff's moderately severe symptoms would cause him to miss 4-5 days of work per month. (AR 740-41.) Dr. Anderson also notes that Plaintiff's medication causes side effects including "chest pain" and "palpation[.]" (AR 741.)

- In September 2016, Dr. Anderson completed another Medical Assessment of Ability to do Work-Related Physical Activities. (AR 742-43.) Therein, he found

that Plaintiff's Hypersomnia, which causes severe daytime sleepiness, precluded Plaintiff from completing an 8-hour work day. (AR 742.) Dr. Anderson added that Plaintiff's symptoms severely impacted Plaintiff's concentration and ability to stay on task, and that he would miss 5+ days of work per month due to his medical condition. (AR 742-43.) Dr. Anderson also circled "None" in response to the question "Is the patient additionally limited by Pain or fatigue? If yes, set forth the degree of limitation." (AR 743.)

- In October 2016, Dr. Anderson completed a third Medical Assessment of Ability to do Work Related Physical Activities. (AR 744-45.) In this assessment, Dr. Anderson again opined that Plaintiff's conditions – in this instance listed as "narcolepsy" and "uncontrolled sleepiness" – preclude an 8-hour work day. (AR 744.) Dr. Anderson notes that Plaintiff experiences seen episodes on "sleepiness" a day, and that the average episode is 2+ hours in duration. (*Id.*) Dr. Anderson represents that Plaintiff's fatigue is a moderately severe limitation, Plaintiff will miss work 5+ days per month, Plaintiff's medication does not cause him side-effectsm and the medical limitations were in existence as of June 1, 2006. (AR 745.)

### B.     ALJ Assessment.

Dr. Anderson's opinions are controverted by the opinion of consultative examiner, Dr. Brian Briggs. (AR 413.) Dr. Briggs examined Plaintiff on May 3, 2016, and opined that Plaintiff had fewer limitations than those assessed by Dr. Anderson. (AR 653.) In his report, Dr. Briggs concluded that Plaintiff's conditions would not impose limitations for 12 continuous months. (AR 657.) Additionally, Dr. Briggs found that Plaintiff had no physical limitations, with the exception that Plaintiff can tolerate only occasional exposure to unprotected heights, or frequent exposure to moving mechanical parts, and can only frequently climb ladders or scaffolds. (AR 660-61.) Dr. Briggs also found that Plaintiff's narcolepsy had improved to the point that it "is no longer an issue." (AR 657.) Because Dr. Anderson's opinions were contradicted by Dr. Briggs's opinion, the ALJ may discount

Dr. Anderson's opinions for specific and legitimate reasons supported by substantial evidence. *Lester*, 81 F.3d at 830-31.

In his decision, the ALJ affords Dr. Anderson's opinions, as a whole, "little weight." (AR 412.) Because Dr. Anderson provided multiple opinions spanning roughly five years, the ALJ attempts to address each of Dr. Anderson's opinions by grouping them into three "batches": (1) the opinion from prior to Plaintiff's date of last insured, December 31, 2011, (2) the opinions made in April and July of 2012, and (3) the opinions made in August and September of 2016. (AR 412-413.) The ALJ does not address Dr. Anderson's medical opinions from August 2014, or from October 2016. (*See id.*) The Court will address the ALJ's reasoning for each batch below.

### C.  July 2011 Opinion.

The ALJ first addresses Dr. Anderson's July 2011 opinion. (AR 412-13.) In that opinion, Dr. Anderson records Plaintiff's subjective report that "because of his daytime sleepiness he still cannot be gainfully employed," then proceeds to provide a physical assessment of Plaintiff, diagnose him with Narcolepsy with Cataplexy, and state in the discussion portion of the report that "[w]e support this patient's disability claim." (AR 301-02.)

The ALJ provided the following reasons for discounting Dr. Anderson's July 2011 opinion: (1) Dr. Anderson "did not provide an assessment of the claimant's functional limitations at that time" (*id.*); (2) Dr. Anderson's "opinion is inconsistent with the treatment record noting improvement with medication and a normal physical and neurological examination[,]" (*id.*); and (3) that Dr. Anderson's opinion is "inconsistent with the claimant's significant activities of daily living during the period" (AR 412-13). The Court finds that the ALJ's decision to discount Dr. Anderson's opinions was [not] based on specific and legitimate reasons.

The ALJ's first reason for discounting Dr. Anderson's July 2011 medical opinion is that Dr. Anderson failed to provide a functional assessment supporting his conclusion. (AR 412.) This reason is not legitimate for rejecting a treating physician's opinion, because

in July 2012, Dr. Anderson provided Plaintiff with a functional assessment specifically noting that the restrictions therein were in existence prior to December 31, 2011. (AR 307-08.)

The ALJ's second reason for discounting Dr. Anderson's July 2011 medical opinion is that the "opinion is inconsistent with treatment record noting improvement with medication and a normal physical and neurological examination." (AR 412.) An ALJ may rely on notes indicating a condition responded well to treatment, and impairments that can be controlled with treatment are not disabling. *See Crane v. Shalala*, 76 F.3d 251, 254 (9th Cir. 1996) (upholding credibility finding where notes from treating therapist suggested depression responded well to treatment); *Warre ex rel. E.T. IV v. Barnhart*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

In its response, the Commissioner cites to the record showing Plaintiff's impairments were controllable with treatment. Specifically, the record shows improvement of Plaintiff's cataplexy with Xyrem (AR 301, 411), and improvement in Plaintiff's narcolepsy on Nuvigil, after the date of last insured (AR 411, 691). Further, Dr. Briggs examination notes that narcolepsy "was no longer an issue" due to Nuvigil (AR 411, 653, 655). (Doc. 15 at 14.)

Plaintiff argues that the Commissioner's citations are misleading and incomplete because Plaintiff's improvement with Xyrem is noted as being limited to his cataplexy. (AR 301), and although Plaintiff was afforded some relief from his narcolepsy with Nuvigil, it was "not enough to increase his daytime sleepiness for employment" (AR 691). (Doc. 25 at 8-9.) But, in that same treatment record, Dr. Anderson notes that he increased Plaintiff's dosage of Nuvigil to 250mg, and found that with the increased dosage, "[Plaintiff] has potential of gaining employment" and "is trying to find work." (AR 691.)

And although Plaintiff "had difficulty getting [Nuvigil] approved" by insurance (AR 691), the record shows that he was still taking the medication as of July 4, 2016 (AR 732). The record does not show that Plaintiff was denied coverage for Nuvigil, or that he

was unable to continue procuring it for himself, as he apparently did for several months between at least February 2016 and July 2016. (*See* AR 691, 732.) Additionally, when Dr. Briggs examined Plaintiff in May 2016, during the time frame that he was on Nuvigil, Dr. Briggs observed that Plaintiff's narcolepsy was "no longer an issue" due to the Nuvigil. (AR 653, 655.) Accordingly, the Court finds that the ALJ's second reason for discounting Dr. Anderson's July 2011 opinion is supported by specific and legitimate reasons, and was not error.

### D. April and July 2012 Opinions.

In April and July 2012, Dr. Anderson completed functional assessments of Plaintiff's capacity to engage in work related activities. (AR 305-06, 307-08.) Therein, Dr. Anderson indicates that Plaintiff has between one and four narcoleptic episodes per day, with each episode lasting more than three hours. (AR 305, 307.) Dr. Anderson opined Plaintiff should have no exposure to unprotected heights, moving machinery, or driving. (AR 306, 308.) He further opined Plaintiff's "degree of restriction" was "moderately severe," defined as seriously affecting ability to function, and "severe," defines as extreme impairment in ability to function. (*Id.*) Dr. Anderson opined that Plaintiff's restrictions existed at that level on or before the date of last insured. (AR 308.)

In his decision, the ALJ discounts these opinions for three reasons: (1) the "opinions are inconsistent with the medical evidence of record discussed above, including noted improvement with Xyrem" (AR 413); (2) the "opinion that claimant experienced symptoms four times a day and symptoms lasted for three hours or more is inconsistent with the evidence that the claimant was the primary care provider for his young son while his wife was at work" (*id.*); and (3) "these opinions were written after the date last insured" (*id.*). The Commissioner concedes that the ALJ's third reason is error (doc. 15 at 17 n.5), but argues that the ALJ's first and second reasons are sufficient for the Court to affirm the ALJ's decision. (*Id.* at 17.) The Court agrees.

The ALJ's first reason, that the opinions are inconsistent with the medical evidence of record discussed above, is supported by the fact that Plaintiff showed marked

improvement with medication in treating both his cataplexy and his narcolepsy. (*See* AR 301, 691, 732.) As discussed above, impairments that can be controlled with treatment are not disabling. *See Warre*, 439 F.3d at 1006.

The ALJ's second reason, that the statement Plaintiff has symptoms lasting at least three or more hours at a time is inconsistent with Plaintiff's childcare activities, is also specific and legitimate. This finding is reasonable. As stated by The Honorable Judge G. Murray Snow, in previous review of this case, "If Dingman's testimony is true, his four-year-old child lacks supervision during much of the day. Thus, Dingman's testimony is not credible unless one believes that he and his wife neglect the care of their small child during these significant lapses." (AR 495.) Dr. Anderson's opinions on this daily frequency was necessarily based on Plaintiff's personal reporting of symptoms. The Court agrees with Judge Snow, and finds that the ALJ's second reason is supported by specific and legitimate reasons.

Plaintiff argues that "the District Court decision overstated symptoms," that "Dingman is easily arousable" and that "even if this level of sleep would be neglect, this is not proof that Dingman's sleep requirements lack credibility" because "Children can be neglected." (Doc. 25 at 3-4.) Plaintiff's points are not persuasive. Even assuming, *arguendo*, the ALJ's second reason was not legitimate, and that Plaintiff's testimony – and thus Dr. Anderson's report – of the frequency of his narcoleptic episodes is true, the ALJ's decision to discount Dr. Anderson's 2012 medical opinions is still supported by specific and legitimate evidence, as noted above in the Court's analysis of the ALJ's first reason for discounting the opinions. Accordingly, the Court finds that the ALJ provided specific and legitimate reasons for discounting Dr. Anderson's 2012 medical opinions.

### E.     August and September 2016 Opinions.

Almost five years after Plaintiff's date of last insured, Dr. Anderson completed three functional assessments of Plaintiff. (*See* AR 740-41 (August 2016); AR 742-43 (September 2016); AR 744-45 (October 2016).) In his decision, the ALJ only expressly addresses the functional assessments from August and September 2016. (*See* AR 413.) In

August 2016, Dr. Anderson opined Plaintiff had "moderately severe" fatigue that would cause him to be off-task 16-20% of a day and that he would miss 4-5 days of work per month. (AR 741.) In September 2016, Dr. Anderson opined Plaintiff had "no" limitation from his fatigue but would miss over 5 days of work per month. (AR 743.)

The ALJ provides the following three reasons for discounting Dr. Anderson's August and September 2016 opinions: (1) Dr. Anderson's opinions are inconsistent with the medical evidence in the record, including Dr. Briggs' observation that the claimant's narcolepsy was well controlled with medication and was no longer a problem; (2) the opinions are inconsistent with records indicating the claimant was cleared to return to work with no restrictions in January 2015 (AR 413, 704, 705); and (3) Dr. Anderson's statement identifying chest pain as a side effect from Plaintiff's medication (AR 741) is inconsistent with his treatment records which indicate that the only side effects from Nuvigil were tolerable headaches (AR 691). The Court need only address the first reason, which is both specific and legitimate for discounting the opinions of Dr. Anderson.

As discussed above, there is sufficient evidence in the record that Plaintiff's impairments are under control with medication. (*See, e.g.*, AR 655, 691.) The ALJ did not err by relying on Dr. Briggs's concurrent evaluation that Plaintiff's narcolepsy was well controlled with medication and no longer a problem. *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (holding that the ALJ did not err in giving minimal weight to the views of treating physicians whose opinions were conclusory, in the form of a check list, lacked substantive medical findings, and conflicted with the "results of a consultative medical evaluation"); *Warre*, 439 F.3d at 1006 ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

Plaintiff argues that the ALJ "did not explain *why* the conflict [that Dr. Briggs observed Plaintiff's narcolepsy was well controlled with medication and was no longer a problem] was substantial evidence for disregarding Dr. Anderson's opinions" and also that "Dr. Briggs's opinion did *not* constitute substantial evidence." (Doc. 14 at 18.) Plaintiff's

arguments fail.

As explained above, the fact that Plaintiff improved on Nuvigil to the point that he was capable of seeking employment is a matter of Dr. Anderson's records. (*See* AR 691.) Dr. Briggs evaluated Plaintiff while he was on that medication, prescribed by Dr. Anderson, and found Plaintiff's narcolepsy to be controlled. (AR 653-64.) Plaintiff's contention that Dr. Briggs's opinion is not substantial evidence because his evaluation was conducted four years after the date of last insured, and he did not review any of Plaintiff's prior medical records, is without merit. *See Orn*, 495 F.3d at 632 (when an examining physician provides "independent clinical findings that differ from the findings of the treating physician," such findings are "substantial evidence.").

Accordingly, the Court finds that the ALJ's decision to discount Dr. Anderson's opinions as inconsistent with the medical evidence in the record was both specific and legitimate, and is supported by substantial evidence.

### F. Opinions from August 2014 and October 2016.

Plaintiff asserts that the ALJ committed harmful error by failing to address Dr. Anderson's opinions from August 2014 and October 2016. (Doc. 14 at 9.) The Commissioner concedes that the ALJ did not specifically address these opinions, but argues that the error is harmless because these opinions are nearly identical to other opinions of Dr. Anderson that the ALJ did address. (Doc. 15 at 16 n.4, 18 n.6.) The Court agrees. *See Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015) ("We reject the idea that not mentioning a treating source's medical opinion precludes use of harmless error doctrine," but "an ALJ must discuss the relevant views of a treating source.").

Here, Dr. Anderson's August 2014 and October 2016 opinions are nearly identical to other opinion evidence that the ALJ did expressly evaluate. (*Compare* AR 702 *with* AR 386; *compare* AR 744-45 *with* AR 742-43.) The ALJ's failure to mention these opinions is error, but that error is harmless because the relevant views of the treating source were discussed and the error does not affect the ultimate nondisability determination of the ALJ. *See Marsh*, 792 F.3d at 1173; *Molina*, 674 F.3d at 1111.

### 3.    Dr. Larry Nichols, M.D.

In May 2011, prior to the date of last insured, Dr. Nichols examined Plaintiff after conducting a review of his neurological treatment notes. (AR 267.) Dr. Nichols opined Plaintiff could sit for six to eight hours per day, stand/walk for three hours per day, and had a medium lifting capacity. (AR 270.) Dr. Nichols further opined Plaintiff had occasional postural restrictions, and some environmental limitations. (AR 271.)

The ALJ afforded Dr. Nichols's opinion "partial weight." (AR 411.) In his decision, the ALJ provided the following analysis:

> Dr. Nichols indicated that the claimant could lift 50 pounds occasionally and 25 pounds frequently and that he could sit for six to eight hours in an eight-hour workday. This opinion is consistent with the medical evidence of record discussed above and the claimant's activities of daily living during the relevant period. However, Dr. Nichols also indicated that the claimant could stand or walk for three hours in an eight-hour workday and that the claimant would have limitations in climbing, stooping, kneeling, crouching, crawling, and reaching as well as working

> [Dr. Nichols's] opinions appear to be based on the claimant's subjective complaints of exhaustion rather than objective medical signs or laboratory findings. As discussed in more detail above, the claimant's physical examination during the consultative examination was normal. Moreover, the opinions regarding the claimant's standing/walking, postural, and environmental limitations are inconsistent with the claimant's significant activities of daily living during the relevant period. Therefore, the undersigned has determined that the claimant was not limited to the extent found by Dr. Nichols.

(*Id.*) In sum, the only material portion of Dr. Nichols opinion rejected by the ALJ, was Dr. Nichols's conclusion that Plaintiff was limited to standing/walking for three hours per day and occasional reaching. (*Id.*)

Plaintiff challenges the ALJ's decision to give "partial weight" to the opinion of Dr. Nichols, arguing that "the ALJ's evaluation of Dr. Nichol[s]'s opinion lacked specificity, and he improperly cherry-picked from Dr. Nichols's findings to support his non-disability finding." (Doc. 14 at 20-21.) But, Dr. Nichols's assessment indicated that Plaintiff could walk normally, take his shoes off without difficulty, get in and out of a chair without difficulty, get on and off of a table without difficulty, tandem walk normally, heel-toe walk normally, hop and squat normally, walk without an assistive device, and that

Plaintiff has a normal range of motion in every joint and spinal region. (AR 269-70.) These independent findings are inconsistent with Dr. Nichols's conclusion that Plaintiff can only stand/walk up to three hours in a day.

Plaintiff argues that the ALJ "cherry-picked" the record (doc. 14 at 21), and notes that Dr. Nichols made reference to Plaintiff's exhaustion (doc. 25 at 11). Plaintiff's argument fails. Plaintiff ignores that the ALJ identified Plaintiff's subjective complaint of exhaustion, and stated that Dr. Nichols's limitation assessments "appear to be based on [Plaintiff's] subjective complaints of exhaustion rather than objective medical signs or laboratory findings." (AR 412.) An ALJ may discount a physician's opinion if it is based to a large extent on the Plaintiff's incredible self-reports. *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014.) The ALJ did not err by assessing partial weight to Dr. Nichols's opinion.

### 4.  Dr. Brian Briggs, M.D.

As mentioned above, Dr. Briggs examined Plaintiff on May 3, 2016. (AR 653.) In his report, Dr. Briggs concluded that Plaintiff's conditions would not impose limitations for 12 continuous months. (AR 657.) Additionally, Dr. Briggs found that Plaintiff had no physical limitations, with the exception that Plaintiff can tolerate only occasional exposure to unprotected heights, or frequent exposure to moving mechanical parts, and can only frequently climb ladders or scaffolds. (AR 660-61.) Dr. Briggs also found that Plaintiff's narcolepsy had improved to the point that it "is no longer an issue." (*Id.*)

In his decision, the ALJ assessed "some" weight to Dr. Briggs's opinion. (AR 412.) Specifically, the ALJ provided:

> Some weight is given the opinions of the consultative examiner, Brian Briggs, M.D. (Exhibits 15F; 16F). Dr. Briggs indicated that the claimant had no limitations. However, he also completed a residual functional capacity assessment indicating that the claimant could occasionally lift and carry up to 100 pounds occasionally and up to 50 pounds frequently, sit for four hours at a time, stand for two hours at a time, and walk for two hours at a time. Dr. Briggs further indicated that the claimant could frequently climb ladders or scaffolds and continuously perform other postural activities. Although this opinion is consistent with the finding that the claimant was not disabled, Dr. Briggs did not have the opportunity to examine the claimant prior to the date last insured. The undersigned finds that the claimant was more limited in his ability to lift and carry and his ability to climb ladders, ropes, and scaffolds

during the relevant period and that the opinions of the State agency consultants are more probative regarding the claimant's limitations at that time. Further, the limitations in sitting and standing are not consistent with the normal physical examination. However, Dr. Briggs' examination and opinion show that the claimant continued to improve with medication. Specifically, Dr. Briggs indicated that the claimant's narcolepsy improved with medication and was no longer an issue. Additionally, the claimant's physical examination remained normal.

(*Id.*) In sum, the ALJ rejected portions of Dr. Briggs's opinion stating that Plaintiff had no limitations climbing ladders, or scaffolds, or performing other postural activities, and instead only gave weight to the portions of Dr. Briggs's opinion that showed Plaintiff's impairments had improved with medication – particularly that Plaintiff's narcolepsy was no longer an issue. (*Id.*)

Plaintiff again argues that the ALJ cherry-picked from Dr. Briggs's opinion to support his non-disability finding. (Doc. 14 at 21-22.) But the ALJ considered Dr. Briggs's opinion as a whole, and only rejected the physical examination portions of Dr. Briggs's opinion, instead finding that Plaintiff "was more limited in his ability to lift and carry and his ability to climb ladders, ropes, and scaffolds during the relevant period[,] and that the opinions of the State agency consultants are more probative regarding the claimant's limitations at that time." (AR 412.) Plaintiff's argument that the ALJ cherry-picked from Dr. Briggs's opinion fails.

Plaintiff argues that Dr. Briggs's opinion is not probative of whether Plaintiff was disabled during the relevant time period because it is based on an examination that took place after Plaintiff's date last insured. (Doc. 14 at 21-22.) But, Ninth Circuit case law provides that "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition." *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) (citing cases from the Eighth, Eleventh, Fourth, Second, and Seventh Circuits); *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1033 n.3 (9th Cir. 2007) (noting that medical reports made after the plaintiff's disability insurance lapsed were relevant and were properly considered by the ALJ and the Appeals Council under *Smith*). Additionally, in this instance, Dr. Briggs's opinion shows that Plaintiff's impairments are

controllable with treatment. And "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre*, 439 F.3d at 1006.

Lastly, Plaintiff complains that the ALJ did not allow questioning of the authors of the reports the ALJ cherry-picked from, and argues that "[i]n such circumstances, those reports do not constitute substantial evidence on which treating physician opinion can be rejected." (Doc. 14 at 22 (citing *Richardson v. Perales*, 402 U.S. 389, 397 (1971).) Plaintiff's argument is not persuasive. *Richardson* stands for the proposition that a physician's report can constitute substantial evidence when a claimant has not exercised the right to seek a subpoena. *See Richardson*, 402 U.S. at 397. Plaintiff improperly infers that because a physician's opinion may be treated as substantial evidence, despite that a plaintiff has not sought a subpoena to depose that individual, the reverse must also be true, and not granting a subpoena request means that the physicians' opinion report is no longer substantial evidence. The ALJ's partial reliance on Dr. Briggs's opinion was reasonable.

## 5. Crediting Non-Examining Physician.

Non-examining physicians, Drs. Rowse and Schenk, each opined that Plaintiff could perform medium work, with postural limitations. (AR 64-66, 76-79.) The ALJ gave the opinions of Drs. Rowse and Schenk "significant weight" because "[t]hese opinions are consistent with the medical evidence discussed above including [Plaintiff's] normal physical and mental exams and his noted improvement with medication." (AR 411.) The ALJ adds that "these opinions are consistent with [Plaintiff's] activities of daily living during the relevant period which included caring for his young son during the day, driving, and shopping in stores. (*Id.*)

Plaintiff argues that the ALJ committed legal error by according the opinions of Drs. Rowse and Shenk significant weight because the ALJ's justification for the assigned weight is conclusory. (Doc. 14 at 20.) Plaintiff cites *Garrison*, 759 F.3d at 1012-13, for the proposition that an "ALJ errors when he rejects opinion while doing nothing more than asserting without explanation that another opinion is more persuasive." (Doc. 14 at 20.)

1  Plaintiff's argument is not persuasive.

2     Plaintiff's argument contemplates a case dealing with the *rejection* of a medical

3  opinion, to argue that the ALJ needed to provide "clear, specific, [and] legitimate" reasons

4  for *accepting* the opinions of Drs. Rowse and Schenk. (*See id*.) But, the ALJ did not err in

5  failing to more fully explain why he credited the opinions of Drs. Rowse and Schenk,

6  because "the ALJ is under no obligation to provide reasons for interpreting and

7  incorporating medical opinions into the RFC assessment." *See Corthion v. Colvin*, No. CV-

8  15-00837-PHX-GMS, 2017 WL 68910, at *6 (D. Ariz. Jan. 6, 2017) citing *Turner v.

9  Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010); *Orteza v. Shalala*, 50 F.3d 748,

10  750 (9th Cir. 1995).

11     Plaintiff cites no authority stating that an ALJ commits legal error by *giving* weight

12  to a medical opinion, and the Court finds none. The Court concludes that the ALJ's decision

13  to credit the opinions of Drs. Rowse and Schenk was not legal error.

14     **c.     The ALJ Did Not Err in Evaluating Plaintiff's Credibility.**

15     In evaluating the credibility of a claimant's testimony regarding subjective pain or

16  other symptoms, the ALJ is required to engage in a two-step analysis: (1) determine

17  whether the claimant presented objective medical evidence of an impairment that could

18  reasonably be expected to produce some degree of the pain or other symptoms alleged;

19  and, if so with no evidence of malingering, (2) reject the claimant's testimony about the

20  severity of the symptoms only by giving specific, clear, and convincing reasons for the

21  rejection. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

22     First, the ALJ found that Plaintiff's medically determinable impairments could

23  reasonably be expected to cause the alleged symptoms. Second, the ALJ found Plaintiff's

24  statements regarding the intensity, persistence, and limiting effects of the symptoms not

25  credible to the extent they are inconsistent with the ALJ's residual functional capacity

26  assessment. In other words, the ALJ found Plaintiff's statements not credible to the extent

27  he claims she is unable to perform in a competitive work environment.

28     At the first hearing, in October 2012, Plaintiff testified that he suffered from two

cataplexy episodes per day, causing him to lose muscle control for 5 to 30 seconds. (AR 38.) He testified that his narcolepsy causes him to fall asleep three to four times per day, for 20 to 45 minutes at a time, for a total of at least three 3 hours and 45 minutes during the day, and up to 5 hours and 45 minutes. (AR 39-42.) Plaintiff testified that his medications were ineffective. (AR 39-40.) Plaintiff states that his typical daily activities include waking up, drinking coffee, talking with his kids, watching cartoons, picking up "something that needs to be picked up," and washing dishes. (AR 39-43.) Plaintiff also will do chores around the house, including folding laundry, doing "a little" yard work, going shopping, driving to the gas station, and cooking dinner occasionally. (AR 45-46.) Plaintiff also testified that he was the sole caregiver for his four-year old son during the day while his wife works. (AR 43, 47.)

At his second hearing, in September 2016, Plaintiff testified that his youngest son was eight-years' old at that time, which would make him about three-years' old on the date last insured. (AR 432, 436.) Plaintiff testified that, during the day, he had to "take naps very regularly" and that he "can't make it through long extended periods of time, like a regular workday, without falling asleep." (AR 436.) When asked how he was able to watch a small child with his condition, Plaintiff responded "[w]ell, I would just take my naps at the same time my child is taking his naps." (AR 436.) Plaintiff testified that when his narcolepsy "comes on" he feels "just extremely tired, oh, like a person that had been up all day long, at the end of a long day." (AR 442.) He stated that he "get[s] the same feeling many times a day[,]" but noted that he "generally" gets a warning of "between maybe five minutes, at the most, and less." (*Id.*) He stated that he was able to take care of his child during the day because "most definitely, unfortunately, I'm an incredibly light sleeper, so I'm . . . the doorbell/the phone, anything would cause me to wake up." (AR 443.)

Plaintiff also testified that he would take his kids to school, but that he would limit himself on how much time he would be on the road at any one point. (AR 444.) Specifically, Plaintiff would drive "a max of about two miles, at absolute most." (*Id.*) Plaintiff noted that his daughter's school is "a mile and a half" away. (*Id.*) Plaintiff also

testified that if he received a narcoleptic warning, he would pull over and take a nap. (*Id.*) Plaintiff also explained that the extreme cataplexy was not an issue, because it is caused by "extreme emotion[,]" and Plaintiff asserts that if he is feeling emotional, he just does not drive. (AR 444-45.)

Plaintiff asserts that he maintains a regular sleep schedule, per doctors' recommendations, and that "sometimes . . . [he] would doze off in addition to the regular schedule." (AR 445.) He also asserts that he was never able to "get through a day without taking a nap or falling asleep." (*Id.*) Plaintiff testified that he was currently taking the medication, Nuvigil. (AR 446.) Plaintiff testified that "it's helped my symptoms. It's not eradicated them or however, you know, it's . . . not a cure, but it's definitely been beneficial to me to . . . have the medicine." (*Id.*) He testified that on the medication, he is able to take a nap between noon and 1:00 pm each day, for about a half-hour, and another nap in the afternoon. (AR 446-47.) Plaintiff also testified that the periods where he just falls asleep are less frequent than before, and that now "it's more isolated toward the afternoon." (AR 447.) Plaintiff testified that he continues to use his CPAP machine for treatment of his sleep apnea. (*Id.*)

The ALJ gave the following reasons for finding Plaintiff's testimony not fully credible: (1) Plaintiff's daily activities are inconsistent with his alleged severity of symptoms, and (2) Plaintiff's statements regarding his symptoms and limitations "are inconsistent with the evidence of record," and (3) Plaintiff has received successful treatment for narcolepsy with cataplexy. (AR 409-11.)

### A. Daily Activities.

An ALJ may reject a claimant's symptom testimony if it is inconsistent with the claimant's daily activities. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). But "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony" about subjective symptoms, like pain or fatigue, "because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d

at 1016. Thus, an ALJ may use a claimant's daily activities to discredit symptom testimony only if the claimant "spend[s] a *substantial part* of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Orn*, 495 F.3d at 639 (emphasis added); *Reddick*, 157 F.3d at 722 ("Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").

Here, the ALJ found that Plaintiff's daily activities were inconsistent with his symptom testimony. Specifically, the ALJ states that Plaintiff's testimony that he is able to take care of his son by "tak[ing] [his] naps at the same time [his] child is taking his naps" is inconsistent with the Plaintiff's "allegations that he would fall asleep four to five times a day in addition to a two-hour nap and that he could fall asleep in public" and that he will "fall[] asleep at inappropriate times and fall[] asleep unplanned" (AR 409). The ALJ makes a second similar observation, stating that Plaintiff's "daily activities of caring for his young son, taking his other children to school, shopping in stores, and driving are inconsistent with [Plaintiff's] allegations of unplanned sleeping and uncontrolled cataleptic attacks. (AR 410.) The ALJ also states that Plaintiff's symptom testimony is inconsistent with the fact that "[Plaintiff] continued to show improvement after the date last insured." (AR 411 (identifying that "[Dr. Briggs] indicated that narcolepsy was no longer an issue due to improvement with Nuvigil.").) The Court agrees, and finds that the reasoning provided by the ALJ for discounting Plaintiff's symptom testimony is sufficient.

Plaintiff argues that the ALJ's reasoning fails because it does not explain *how* these daily activities conflict with Plaintiff's testimony. (*See* doc. 25 at 15.) Plaintiff argues that it is clear that Plaintiff's condition is not a "totally debilitating impairment." (*Id.*) Plaintiff asserts that he has testified that his impairments permit him to "exercise to some amount, read, watch television, and spend time with children[,]" but they also cause him to "need to nap[,]" which creates "a lack of consistency in sustaining activities due to exhaustion." (*Id.*) But, Plaintiff asserts, the ALJ does nothing to explain how the daily activities he describes show that Plaintiff's symptoms are less severe than he has testified. (*Id.*)

Plaintiff's argument is unavailing.

The ALJ identifies specific inconsistencies between Plaintiff's testimony and the record, including that (1) Plaintiff's testimony that he would fall asleep unplanned and uncontrolled is inconsistent with being the sole caretaker for his young son; and (2) Plaintiff's testimony that he would fall asleep in public places while sitting is inconsistent with his testimony that he does not fall asleep in traffic. This is a clear and convincing reason to discredit Plaintiff's testimony regarding the severity of his symptoms. *See Thomas*, 278 F.3d at 954 ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld.").

### B. Inconsistent with the Medical Record.

The ALJ next found that Plaintiff's statements regarding his symptoms and limitations "are inconsistent with the evidence of record." (AR 410.) Specifically, the ALJ observes that "[i]n a sleep history questionnaire, [Plaintiff] reported a high chance of falling asleep while sitting and reading, watching television, lying down to rest, and sitting quietly after a meal (Exhibit 3F/23)." (*Id.*) "[Plaintiff] also reported a moderate chance of falling asleep when while sitting inactive in a public place, as a passenger in a car for one hour without a break, and while sitting and talking to someone (Exhibit 3F/23)." (*Id.*) But "[Plaintiff] reported no chance of falling asleep while driving in a car stopped in a few minutes of traffic (Exhibit 3F/23)." (*Id.*) The ALJ opines that "[Plaintiff's] allegations of uncontrolled sleepiness and falling asleep in public places or while sitting are inconsistent with his allegation that he would not fall asleep while sitting in traffic." (*Id.*)

Plaintiff argues that the questionnaire "addressed falling asleep while *driving* and stopped in a *few* minutes of traffic. [(AR 259-61.)]" (Doc. 14 at 26.) "Driving is not comparable to sitting inactive." (*Id.*) Plaintiff has also argues that he has reduced his driving to only 1-2 miles at a time, and has stated on multiple occasions that he has been forced to pull over and rest. (*See* AR 45-46, 443-44, 385, 709, 707, 700, 693.) As discussed above, the Court agrees with the ALJ that Plaintiff's testimony regarding his ability to drive

is inconsistent with his testimony of falling asleep while sitting inactive. But this does not show an inconsistency between Plaintiff's testimony and the medical records.

> The ALJ also notes that

> although the claimant alleged falling asleep in inappropriate places such as doctor's offices (Exhibit 4E), he was routinely observed to be awake, alert, and oriented during medical appointments and he had normal orientation, memory, attention, language, and fund of knowledge (Exhibits 2F/2, 4, 6; 3F/l, 4; *SF/2*, 5; 7F/2; 11F/29). Moreover, while the claimant alleged that he did not walk regularly or exercise because he was too tired (Exhibit 4E), he told a treatment provider that he exercised two to three times a week (Exhibit SF/4). The claimant was also encouraged to be physically active for at least 30 minutes on most or all days of the week (Exhibit SF/2). Specifically, it was suggested that the claimant set a goal for moderate intensity physical activities such as walking at a brisk pace and that he take the stairs rather than the elevator and go for a walk after dinner (Exhibit SF/2). Accordingly, the evidence does not support that the claimant was limited to the extent he alleged.

(*Id.*) Each of these "inconsistencies with the medical record" identified by the ALJ are taken out of context, and in a vacuum. Plaintiff has testified that he is easily aroused from sleep, and that he has forewarning before a narcoleptic episode forces him to lie down. Thus, it is not inconceivable that Plaintiff would fall asleep in a doctor's office while waiting, and be woken when his name is called. Or that he would avoid exercise because he felt a narcoleptic episode coming on. Additionally, Plaintiff's testimony is not inconsistent with the medical record because physicians have advised him to be physically active, park far from the door at stores, or to take the stairs instead of the elevator. In fact, those recommendations and advisements do not speak to Plaintiff's symptoms at all.

The Court finds that the ALJ's reasoning that Plaintiff's symptom testimony is inconsistent with the medical record is not supported by substantial evidence that "is specific, clear, and convincing." *See Vasquez*, 572 F.3d at 591. Accordingly, this reasoning by the ALJ fails to justify discrediting Plaintiff's symptom testimony.

### C.     Plaintiff has received Successful Treatment.

The ALJ's third reason for discounting Plaintiff's symptom testimony is that the record shows he has "received treatment for narcolepsy with cataplexy." (AR 410.) Initially, Plaintiff's progress was stunted because he either was not on medication, or would

fail to consistently take the medication when prescribed. (AR 410.) Specifically, the ALJ states that

> In August 2008, the claimant told a treating physician that he had at 15-year history of narcolepsy and cataplexy, but he had not received treatment for these conditions (Exhibit 1F/2). In December 2009, it was noted that the claimant was not currently on medication (Exhibit 2F/5). The claimant was prescribed medication for his narcolepsy with cataplexy (Exhibit 2F/7). After beginning medication, it was noted that the claimant was no longer falling down due to cataplexy (Exhibit 2F/l). However, the claimant was inconsistent with taking his medication. In May 2010, it was noted that the claimant stopped taking his medication after one month because he felt it did not help him (Exhibit 2F/4). Further, a treatment provider indicated that it was difficult to assess the efficacy of the medication Xyrem because the claimant stopped using it (Exhibit 13F/5). Subsequently, it was noted that the claimant's symptoms improved with Xyrem (Exhibit 7F/l).

(AR 410-411.) The ALJ also notes that "[Plaintiff] continued to show improvement after the date last insured. Specifically, it was noted that the claimant had relief from Nuvigil and that he was doing well with Nuvigil (Exhibit 18F/l, 17)." (AR 411.) Further, it was observed by consultative examiner, Dr. Briggs, "that narcolepsy was no longer an issue due to improvement with Nuvigil." (AR 411; 653.)

The Commissioner argues that this evidence cited by the ALJ shows that Plaintiff's narcolepsy was controlled with treatment after Plaintiff's date last insured, and that "the salient question under *Warre* is whether the condition could be controlled with medication. Here, the consultative examination, as well as Dr. Anderson's treatment notes . . . support the ALJ's finding." (Doc. 15 at 11.) The Court agrees.

Plaintiff argues that the ALJ's opinion is identifying a "lack" of evidence as a reason for discounting Plaintiff's testimony, and that the Commissioner is engaging in improper *post hoc* reasoning. (Doc. 25 at 17 (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Longstanding principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ – not *post hoc* rationalizations that attempted to intuit what the adjudicator may have been thinking."). Plaintiff's argument is not persuasive.

This is not *post hoc* reasoning. In his decision, the ALJ clearly indicates that Plaintiff's condition was controlled with treatment. (*See* AR 411.) The ALJ also indicates

that Plaintiff showed improvement with the medication Xyrem before he stopped taking it because "he felt it did not help him." (*Id.*) The ALJ also notes that, when treated with Nuvigil, Plaintiff's narcolepsy "was no longer an issue[,]" according to Dr. Briggs. (*Id.*) The Court finds the ALJ's reasoning to present specific clear, and convincing reasons for discounting Plaintiff's testimony. *See Vasquez*, 572 F.3d at 591.

**V.    Conclusion.**

The ALJ has provided sufficient, clear and convincing reasons for discounting Plaintiff's symptom testimony. Specifically, The ALJ's reasoning that (1) Plaintiff's daily activities are inconsistent with his alleged severity of symptoms, and (2) Plaintiff has received successful treatment for narcolepsy with cataplexy (AR 409-11), constitute clear and convincing reasons to discount Plaintiff's testimony. Additionally, the ALJ has provided specific and legitimate reasons for discounting the opinion evidence of Plaintiff's treating physician, Dr. Anderson. Accordingly, the Court finds that the ALJ did not engage in legal error and that his decision is supported by substantial evidence. Accordingly,

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is **affirmed**. The Clerk shall enter judgment accordingly and **terminate** this case.

Dated this 27th day of September, 2018.


_____
Honorable John Z. Boyle
United States Magistrate Judge